UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

JEFFREY S. GUDES, D.O.,

    Plaintiff,

vs.

WILSON HEALTH, *et al.*,

    Defendants.

Case No. 3:22-cv-341

District Judge Michael J. Newman
Magistrate Judge Caroline H. Gentry

---

**ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. No. 11); (2) DENYING WITHOUT PREJUDICE, AND SUBJECT TO EXHAUSTION OF HIS ADMINISTRATIVE REMEDIES, PLAINTIFF'S REQUEST FOR A PERMANENT INJUNCTION; AND (3) DENYING AS MOOT DEFENDANTS' MOTION TO DISMISS (Doc. No. 6)**

---

This civil case, premised on diversity jurisdiction, is now before the Court on a Fed. R. Civ. P. 12(b)(6) motion to dismiss (Doc. No. 6) and a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings (Doc. No. 11) filed by all Defendants—Wilson Health; the Shelby County Memorial Hospital Association; Wilson Health Foundation; and Robert McDevitt, Jr., M.D. ("Dr. McDevitt").[1]  In response to the motion to dismiss, Plaintiff Jeffrey S. Gudes, D.O., ("Dr. Gudes") filed an amended complaint.  Doc. No. 8.  Defendants answered (Doc. No. 10), and then they filed their motion for judgment on the pleadings, seeking dismissal of Dr. Gudes's amended complaint.  Doc. No. 11.  In response, Defendants reincorporate in their motion for judgment on the pleadings

---

[1] Sitting in diversity, federal courts apply "the choice of law rules and substantive law of the forum state[,]" which is Ohio.  *Smith v. Gen. Motors, LLC*, 988 F.3d 873, 879 (6th Cir. 2021) (quoting *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008)).  Diversity jurisdiction exists here because all Defendants are Ohio citizens, and Dr. Gudes is a Michigan citizen.  Doc. No. 8 at PageID 38–39.

their arguments made in their motion to dismiss.[2] *Id.* at PageID 61–62. Dr. Gudes opposes both motions. Doc. No. 14. Defendants replied, making these motions ripe for review. Doc. No. 15.

**I.**

The following facts are taken as true as alleged in the amended complaint, the operative pleading for deciding this motion. Doc. No. 8. Dr. Gudes worked at Wilson Memorial Hospital—owned by Wilson Health—in Shelby County, Ohio after completing his residency.[3] *Id.* at PageID 40. He alleges that he did not receive any complaints or reprimands about his job performance during his tenure. *Id.*

His problems began shortly after he decided to move and take a position with a hospital in Florida. On November 20, 2021, he notified Wilson Memorial Hospital's staffing director that he was resigning on January 31, 2022. *Id.* As part of his transfer process, Dr. Gudes had to perform "a self-query from the National Practitioner Data Bank" ("NPDB"). *Id.* at PageID 41. When he queried himself on December 28, 2021, the result was "a clean check" that revealed no incidents. *Id.*

---

[2] "As a general matter, an 'amended complaint supersedes the original complaint, thus making the motion to dismiss the original complaint moot.'" *Green v. Mason*, 504 F. Supp. 3d 813, 826 (S.D. Ohio 2020) (quoting *Ky. Press Ass'n, Inc. v. Kentucky*, 355 F. Supp. 2d 853, 857 (E.D. Ky. 2005)) (citing *Glass v. Kellogg Co.*, 252 F.R.D. 367, 368 (W.D. Mich. 2008)). The arguments made in the motion to dismiss, however, remain relevant to deciding whether to dismiss the amended complaint because Defendants allege that the deficiencies they identified in their motion to dismiss apply to the amended complaint. *See Yates v. Applied Performance Techs., Inc.*, 205 F.R.D. 497, 499–500 (S.D. Ohio 2002) ("[I]f [an] amended complaint suffers from [the] same deficiencies addressed in [a] motion to dismiss, the court may consider that motion as addressing the amended complaint." (citing *Jordan v. City of Philadelphia*, 66 F. Supp. 2d 638, 641 n.1 (E.D. Pa. 1999))).

[3] Dr. Gudes refers to "Wilson Health"—"a fictitious name"—throughout his complaint as a collective term to refer to the nonparty Defendants, *i.e.*, the Shelby County Memorial Hospital Association and the Wilson Health Foundation. Doc. No. 8 at PageID 39. In his words, "[b]y naming the fictious name Wilson Health as a defendant, he intends to pursue claims and relief against all entities that use that fictitious name or that used that fictitious name during the times relevant to this matter." *Id.* Thus, the Court shall adhere as closely as it can to Dr. Gudes's naming convention to correspond to his allegations, but it shall refer to the relevant individual Defendants, or all Defendants, where necessary to eliminate confusion.

Nonetheless, on January 21, 2022, he received a letter from Dr. McDevitt stating that the Multidisciplinary Peer Review Committee ("MPRC") had reviewed two of his cases from earlier that month. *Id.* In their view, Dr. Gudes performed his duties in those cases with "continued substandard and dangerous care[,]" leading Dr. McDevitt to recommend "summary suspension of Dr. Gudes's privileges at Wilson Health." *Id.* (cleaned up). Three days later, the Medical Executive Committee at Wilson Memorial Hospital informed Dr. Gudes that it would perform a "formal corrective action investigation" of his conduct at the MPRC's request, but it has never informed him about the investigation, or its result, to this date. *Id.*

Dr. Gudes alleges that he did not hear anything about Wilson Health's dissatisfaction with his performance until February 28, 2022, when the Florida hospital informed him of an "abnormality"—something Dr. Gudes labels a "false report[,]" *id.* at PageID 42—in his file from Wilson Health. Dr. Gudes accessed this in a report from NPDB (hereinafter, "First NPDB Report"). *Id.* In this "false report," Wilson Health allegedly described Dr. Gudes as having "voluntarily surrender[ed] . . . his clinical privilege(s) while under, or to avoid, investigation relating to professional competence or conduct[,]" based on his "substandard or inadequate care" and "patient abuse." *Id.* Dr. Gudes alleges, "The report lists the 'date of action' as January 31, 2022—the same day as the effective date of Dr. Gudes's November 2021 resignation." *Id.* Reading this information in the First NPDB Report allegedly led the Florida hospital to deny "credentialing" him (*i.e.*, judging him qualified for the position), and Dr. Gudes learned of the Florida hospital's decision on March 1, 2022. *Id.*

When he tried calling Wilson Health's staff members, various individuals would not give him any information about the investigation, including Dr. McDevitt. *Id.* at PageID 42–43. But, after Dr. Gudes talked with the director in the Florida hospital, he learned that Dr. McDevitt

3

"smeared Dr. Gudes's name, said he would never hire him, and made the false factual statements that Dr. Gudes had behavioral problems and a 'bunch of bad cases.'" *Id.* at PageID 43. These statements were allegedly false and either Dr. McDevitt knew that they were false, or he recklessly disregarded their falsity, harming Dr. Gudes's reputation. *Id.*

On or about April 6, 2022, Wilson Health amended the First NPDB Report. *Id.* at PageID 44. In this, the "Second NPDB Report," Wilson Health claimed that Dr. Gudes "allowed privileges to expire while under investigation" and "resigned from the Wilson Health Medical Staff effective January 31, 2022 while under investigation." *Id.* This was false, according to Dr. Gudes, because Wilson Health had known that he was resigning for over two months—*i.e.*, well before any investigation into his allegedly unprofessional practices began. *Id.* Dr. Gudes further contends Dr. McDevitt made these false, harmful statements because he "resented Dr. Gudes for resigning from Wilson Health and knew that false NPDB reports would jeopardize his future employment opportunities." *Id.* at PageID 44–45. Eventually, these issues allegedly caused Dr. Gudes to lose other employment opportunities, including an offer from a New Mexico hospital, which it revoked upon reading the Second NPDB report. *Id.* at PageID 45.

Dr. Gudes now sues Defendants, levying three tort claims under Ohio law: (1) defamation against all Defendants for submitting the First NPDB Report; (2) defamation against Dr. McDevitt for slandering him to the Florida and New Mexico hospitals; and (3) tortious interference with prospective contracts and employment against all Defendants for interfering with his prospective employment in Florida and New Mexico. *Id.* at PageID 46–48. He seeks damages, but he also requests "a permanent injunction requiring [D]efendants to withdraw their adverse NPDB reports about [him.]" *Id.* at PageID 49. In response, Defendants contend that the statements were privileged and that they are immune from suit under federal and Ohio law. *See* Doc. Nos. 6, 11.

4

## II.

Federal Rule of Civil Procedure 12, like all other Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

Motions for judgment on the pleadings under Rule 12(c) are analyzed under the same standard as motions to dismiss under Rule 12(b)(6). *See Roth v. Guzman*, 650 F.3d 603, 605 (6th Cir. 2011). For both motions, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quotation omitted). The Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences." *Winget*, 510 F.3d at 582–83 (citation omitted) (quotation omitted).

"[D]istrict courts have 'a duty to address' . . . immunity when it is 'properly raised prior to discovery.'" *Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022) (quoting *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004)) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002)). "A district court [is] required to determine—prior to permitting . . . discovery— whether [a] complaint" must be dismissed based on immunity. *Skousen*, 305 F.3d at 527. "[T]o dismiss [a plaintiff's] complaint at this stage, [the Court] must find that it is 'devoid of [allegations] tending to show that the [defendants] acted'" in a manner that abrogates their immunity. *Novak v. City of Parma*, 932 F.3d 421, 437 (6th Cir. 2019) (quoting *Irving v. Austin*, 138 N.E.2d 931, 934 (Ohio 2000)) (citing *Range v. Douglas*, 763 F.3d 573, 586 (6th Cir. 2014)).

Nonetheless, courts should remain "reluctant to dismiss complaints based on affirmative defenses at the pleading stage and before discovery is conducted." *Lockhart v. Holiday Inn Exp. Southwind*, 531 F. App'x 544, 547 (6th Cir. 2013) (citations omitted); *see Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017). "The fact-intensive nature of . . . immunity makes it often a bad fit for Rule 12(b)(6)." *Siefert v. Hamilton County*, 951 F.3d 753, 761 (6th Cir. 2020) (citing *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019)); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal."). That is why even though "immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (cleaned up); *see also Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring).

### III.

The Court shall grant in part and deny in part Defendants' motions. Defendants' arguments—including their immunity arguments—are all better suited for resolution after discovery. However, Defendants correctly note that this Court may not grant injunctive relief unless, and until, Dr. Gudes exhausts his administrative remedies.

**A.  Health Care Quality Improvement Act of 1986 ("HCQIA") Immunity**

Defendants first claim immunity under the HCQIA. Doc. No. 6-1 at PageID 23.

The HCQIA requires hospitals to make reports to the NPDB about personnel actions, which would encompass the reporting about Dr. Gudes's alleged misbehavior that was under investigation. *See* 42 U.S.C. § 11133(a)(1). Under 42 U.S.C. § 11137(c), "no person or entity … shall be held liable in any civil action with respect to any report made under this subchapter[,]" including reports made under § 11133. 42 U.S.C. § 11137(c). But that immunity does not apply

6

if the statements are made "with[] knowledge of the falsity of the information contained in the report." *Id.*; *see, e.g.*, *Reyes v. Wilson Mem'l Hosp.*, 102 F. Supp. 2d 798, 821 (S.D. Ohio 1998) ("Because there is no allegation . . . that the information contained within the reports—that the Plaintiff was suspended—was knowingly false, the Court concludes that the immunity applies."). As to "falsity," "a general consensus has emerged that courts do not evaluate whether the underlying merits of the reported action were properly determined but instead evaluate whether the report itself accurately reflected the action taken." *Robinson v. E. Carolina Univ.*, 329 F. Supp. 3d 156, 177 (E.D.N.C. 2018) (internal quotation marks omitted) (collecting cases). "[T]his immunity is unavailable if 'there is sufficient evidence for a jury to conclude that the report was false and the reporting party knew it was false.'" *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 733 (E.D. Mich. 2009) (quoting *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1334 (10th Cir. 1996)); *see also Meyers v. Logan Mem'l Hosp.*, 82 F. Supp. 2d 707, 716 (W.D. Ky. 2000) (same).

Dr. Gudes alleges that he did not perform "substandard care" and did not relinquish his physician privileges to leave for his job in Florida—contrary to the First NPDB Report—so he plausibly alleges that the First NPDB contained false information. Doc. No. 8 at PageID 43–44. He further alleges that Defendants were aware that the "investigations" did not begin until after they were apprised of Dr. Gudes's new employment opportunity in Florida, so he contends that Defendants possessed knowledge contradicting their narrative before defaming him. *Id.*; Doc. No. 14 at PageID 83.

Importantly, Dr. Gudes alleges that the reasons stated in the First and Second NPDB reports were inaccurate and pretextual, arguing that they contained false information in retaliation for his decision to move to Florida. Doc. No. 8 at PageID 44–45. Thus, drawing all reasonable inferences

7

in his favor, that calls into question "whether the report itself accurately reflected the action taken[,]" *Robinson*, 329 F. Supp. 3d at 177 (quoting *Murphy v. Goss*, 103 F. Supp. 3d 1234, 1239 (D. Or. 2015)) (collecting cases), *i.e.*, whether or not it is accurate that Dr. Gudes performed with substandard care or knowingly resigned during an investigation into his standard of care. Under similar circumstances, the District of New Jersey denied a motion to dismiss in *Alexander v. Hackensack Meridian Health*, No. 19-18287, 2020 WL 5810526, at *12 (D.N.J. Sept. 30, 2020). The plaintiff in *Alexander* argued that the proffered reasons for terminating his employment as a physician—"that [he] exhibited 'substandard or inadequate care' and 'professional misconduct which relates adversely to patient safety'"—were pretextual and untrue. *Id.* at *13. Similar to *Alexander*, Defendants amended the First NPDB Report to excise the allegedly false claims that Dr. Gudes acted with substandard care, but this neither undermines the potential falsity of either Report nor eliminates the plausible inference that Defendants acted pretextually by amending the First NPDB Report to hide their purportedly tortious behavior. *See id.*; *see also, e.g.*, *Brown*, 101 F.3d at 1334 (finding report potentially "false" for listing incorrect reason for disciplinary action taken against the plaintiff); *Elkharwily v. Franciscan Health Sys.*, No. 3:15-cv-05579, 2015 WL 7758550, at *2 (W.D. Wash. Dec. 1, 2015).[4] Thus, construing Dr. Gudes's amended complaint in the light most favorable to him, he has plausibly alleged—at this preliminary stage—that Defendants have acted in a manner that abrogates their immunity under the HCQIA.

### B. HCQIA Exhaustion

Defendants also contend that Dr. Gudes did not exhaust the HCQIA's administrative remedies, barring this suit. Doc. No. 6-1 at PageID 25–26.

---

[4] The court in *Elkharwily* addressed a *pro se* complaint, but it did not apply the generous standard that courts ordinarily employ when judging *pro se* pleadings. *See Elkharwily*, 2015 WL 7758550, at *2. Therefore, that court employed the same standard of review that applies here, so *Elkharwily* is particularly analogous and persuasive here.

The HCQIA contains procedures for the Secretary of Health and Human Services to conduct an administrative review of an NPDB report. *See* 42 U.S.C. § 11136; 45 C.F.R. § 60.21. "The subject of the report or a designated representative may dispute the accuracy of a report concerning himself[ or] herself[.]" 45 C.F.R. § 60.21(a). The Secretary only reviews the "accuracy" of the report and does "not consider the merits or appropriateness of the action or the due process that the" reported physician received. *Id.* § 60.21(c)(1). A physician "who disagrees with the reported information . . . *must* request . . . that the NPDB enter the report into 'disputed status[,]'" and is obligated to work with the reporting entity to resolve the dispute. *Id.* § 60.21(b)(1)–(3) (emphasis added). If the Secretary "[c]oncludes that the information contained in the report is inaccurate," then "the Secretary will inform the subject of the determination and direct the NPDB or the reporting entity to revise the report." *Id.* § 60.21(c)(2)(ii). This also requires the NPDB to "distribute the corrected report and statement(s) to previous queriers (where identifiable), the reporting entity and the subject of the report." *Id.*

"[T]he general rule is that parties must 'exhaust prescribed administrative remedies before seeking relief from the federal courts.'" *Satgunam v. Mich. State Univ.*, 556 F. App'x 456, 464 (6th Cir. 2014) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992)); *cf. Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999) (applying administrative exhaustion for state-law, diversity claims). Nonetheless, "[w]hen 'Congress has not clearly required exhaustion, sound judicial discretion governs' whether or not exhaustion should be required." *Shearson v. Holder*, 725 F.3d 588, 594 (6th Cir. 2013) (quoting *McCarthy*, 503 U.S. at 145). The Sixth Circuit has identified two forms of administrative exhaustion that apply if Congress has not mandated it. *See Joseph Forrester Trucking v. Dir., Off. of Workers' Comp. Programs*, 987 F.3d 581, 587 (6th Cir. 2021); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 746–48 (6th Cir. 2019). First, there is

9

"regulatory exhaustion[,]" *Joseph*, 987 F.3d at 587, which applies where an agency imposes "regulations detailing their internal-claims processing rules" that require exhaustion. *Island Creek*, 937 F.3d at 747. Second, under "prudential exhaustion[,]" *Joseph*, 987 F.3d at 587, "a court may still impose an *implied* exhaustion rule as long as the rule comports with the statutory scheme." *Island Creek*, 937 F.3d at 747 (emphasis in original) (citing *Sims v. Apfel*, 530 U.S. 103, 108–10 (2000)).

The HCQIA does not explicitly require exhaustion, *see* 45 C.F.R. § 60.21(a) ("Who *may* dispute the NPDB information" (emphasis added)), and Defendants only point to a provision that allows the Secretary to adopt regulations allowing physicians to challenge the accuracy of an NPDB report. 42 U.S.C. § 11136(2) ("[T]he Secretary shall, by regulation, provide for . . . procedures in the case of disputed accuracy of the information."). The Court construes Defendants' argument to rely on "regulatory exhaustion" imposed under the Secretary's regulatory scheme. *Joseph*, 987 F.3d at 587. However, the prescribed remedy under the regulations—to amend the report and remove the damaging information—does not supersede damages claims. *See* 45 C.F.R. § 60.21(c)(2)(ii). Thus, as explained in more detail below, courts faced with this issue divide claims—that coincide with HCQIA's administrative scheme—into two categories: (1) injunctive claims seeking to remove or amend the Reports, which require administrative exhaustion; and (2) damages claims, which do not require exhaustion. *See Robinson*, 329 F. Supp. 3d at 172–73; *Miller v. Huron Reg'l Med. Ctr.*, 145 F. Supp. 3d 873, 886 (D.S.D. 2015); *Baptiste v. Dep't of Def.*, No. 22-00210, 2022 WL 17585625, at *10–11 (D. Haw. Dec. 12, 2022); *Zawislak v. Mem'l Hermann Hosp. Sys.*, No H-11-1335, 2011 WL 5082422, at *2 (S.D. Tex. Oct. 26, 2011).

For example, the Sixth Circuit found in *Satgunam v. Michigan State University* that a district court properly denied a plaintiff's request for injunctive relief to extinguish an NPDB

10

report. 556 F. App'x at 465. In pertinent part, the Sixth Circuit held that "[i]ssues regarding the content and accuracy of Data Bank reports are clearly within the Secretary's authority[,]" so that counseled towards imposing an implied exhaustion requirement for HCQIA claims seeking to change or alter an NPDB report. *Id.* (citations omitted). Effectively, by challenging the accuracy of the NPDB report under the regulations, "the Secretary would be able to address [that] claim[,]" so the plaintiff was required to petition the Secretary to change the report before seeking injunctive relief in court. *Id.*

Following suit, courts outside of the Sixth Circuit have also found that the HCQIA's administrative scheme impliedly precludes individual suits for declaratory or injunctive relief seeking to amend or remove false statements in NPDB reports. *See Robinson*, 329 F. Supp. 3d at 172–73; *Baptiste*, 2022 WL 17585625, at *10–11; *Gonino v. Priv. Health Care Sys., Inc.*, No. 3:04-CV-1940G, 2004 WL 2583625, at *2 (N.D. Tex. Nov. 12, 2004) (collecting cases); *cf. Brown v. Med. Coll. of Ohio*, 79 F. Supp. 2d 840, 845 (N.D. Ohio 1999) ("The regulations accompanying the HCQIA set out a comprehensive administrative scheme for challenging the accuracy of a report made to the NPDB."). But most courts have agreed that the regulatory scheme covers only *amending* or *removing* an NPDB report, thus permitting plaintiffs' tort claims for damages against reporting entities to proceed. *See Ritten*, 611 F. Supp. 2d at 733–34; *Miller*, 145 F. Supp. 3d at 886; *Baptiste*, 2022 WL 17585625, at *10–11; *Zawislak*, 2011 WL 5082422, at *2.

This leads to Defendants' main argument: Dr. Gudes must exhaust every claim because the Secretary's regulations "provide[] specific procedures for disputing a report[.]" Doc. No. 6-1 at PageID 26; *see also* Doc. No. 11-1 at PageID 65–66. However, as noted above, Defendants do not account for the distinction between injunctive relief and damages. Even the authorities Defendants rely upon recognize this distinction because the plaintiffs there sought *only* injunctive

11

relief in changing the disputed information in the reports—not damages.[5] *See* Doc. No. 6-1 at PageID 26; *Ritten*, 611 F. Supp. 2d at 733–34; *Gonino*, 2004 WL 2583625, at *2; *Anbar v. Leahan*, No. 97-CV-1138, 1998 WL 314691, at *8 (E.D. Pa. June 11, 1998) (dismissing only injunctive relief claim but allowing a plaintiff's defamation claim to proceed to trial). Because Dr. Gudes also seeks damages to redress the harm he has suffered from alleged falsehoods, those claims may proceed to discovery. Doc. No. 8 at PageID 43–46, 48–49; *see Ritten*, 611 F. Supp. 2d at 733–34 (rejecting administrative exhaustion argument on similar grounds).

In sum, because he has not exhausted his administrative remedies available under the HCQIA and the applicable regulations, Dr. Gudes may not now request "a permanent injunction requiring defendants to withdraw their adverse reports about [him,]" Doc. No. 8 at PageID 49, but he may sue for damages, so Defendants' motions shall be granted in part and denied in part. Dr. Gudes may seek a permanent injunction once he has exhausted those administrative remedies.

### C. Ohio Revised Code § 2305.251

Ohio Revised Code § 2305.251(A) imposes the following immunity for health care entities:

> No health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity. No individual who is a member of or works for or on behalf of a peer review committee of a health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the peer review committee.

---

[5] Defendants' cases are further distinguishable based upon their procedural posture and the arguments made therein. For instance, *Rogers v. Columbia/HCA of Central Louisiana* is inapplicable because the court found that the peer review process was ongoing, while Dr. Gudes does not so allege. 961 F. Supp. 960, 968 (W.D. La. 1997); *see Morice v. Hosp. Serv. Dist. #3*, 430 F. Supp. 3d 182, 206–07 (E.D. La. 2019) (distinguishing *Rogers* on similar grounds). *Bigman v. Medical Liability Mutual Insurance Company* concerned only injunctive relief. No. 95 CIV. 1733, 1996 WL 79330, at *1 (S.D.N.Y. Feb. 22, 1996). Finally, the court in *Brown v. Medical College of Ohio* found that the HCQIA does not create a private right of action allowing a physician to challenge an NPDB report; this argument is not before this Court. 79 F. Supp. 2d at 846; *see also, e.g.*, *Ritten*, 611 F. Supp. 2d at 734; *Bonzani v. Goshen Health Sys. Inc.*, No. 3:19-CV-586, 2022 WL 715548, at *9 n.4 (N.D. Ind. Mar. 10, 2022).

Ohio Rev. Code § 2305.251(A). Under Ohio law, to overcome this immunity, the plaintiff must show that the defendant "acted with 'actual malice' in publishing" his or her statements. *Jacobs v. Frank*, 573 N.E.2d 609, 613 (Ohio 1991). "Actual malice in this context requires proof that defendants made statements in connection with the peer review process with knowledge they were false or with reckless disregard for whether they were true or false." *Wall v. Ohio Permanente Med. Grp., Inc.*, 695 N.E.2d 1233, 1241 (Ohio Ct. App. 1997) (citing *Jacobs*, 573 N.E.2d 612–14). "[M]ere inaccuracies in statements and alleged improper motivations by speakers are insufficient to show actual malice." *Talwar v. Cath. Healthcare Partners*, 258 F. App'x 800, 809 (6th Cir. 2007) (quoting *Wall*, 695 N.E.2d at 1241). "Under federal pleading requirements, a complaint asserting a defamation claim as to which the actual malice standard applies must set forth facts establishing that the statements were made with malice to avoid dismissal." *Green v. Mason*, 504 F. Supp. 3d 813, 831 (S.D. Ohio 2020) (cleaned up) (quoting *Carovac Lake Cnty. Bd. of Developmental Disabilities/Deepwood*, No. 1:19-cv-2344, 2020 WL 5423966, at *5 (N.D. Ohio Sept. 9, 2020)) (citing *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 892 (2d Cir. 2012)).

Drawing all reasonable inferences in Dr. Gudes's favor, he has pled a plausible claim for relief. He alleges that Wilson Health amended the First NPDB Report to reflect a separate justification for its actions—a factual allegation that, when reasonably construed in his favor, suggests that Defendants knew or recklessly disregarded whether the statements in the First NPDB Report were false, yet published them anyway. Doc. No. 8 at PageID 44–46. Although conclusory allegations—that Defendants were acting pretextually—would not survive dismissal, *see Wall*, 695 N.E.2d at 1241, Dr. Gudes's allegations—that Wilson Health amended the First NPDB Report and did not respond to his inquiries at all during this period—suggest "that the stated reasons for [the reports] were false and that, in fact, the [reports] represented retaliation for" Dr. Gudes's

13

decision to seek employment elsewhere. *Mehlman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 1:20-cv-813, 2021 WL 4430631, at *5 (S.D. Ohio Apr. 26, 2021), *report & recommendation adopted*, 2021 WL 3560571, at *8 (S.D. Ohio Aug. 11, 2021). Considering the relatively light burden at this stage of proceedings, Defendants' analogy to *Talwar v. Catholic Healthcare Partners*, 258 F. App'x 800 (6th Cir. 2007)—which was resolved on summary judgment with a full record—is inapt. Doc. No. 6-1 at PageID 25. Even Defendants tacitly acknowledge that this is an issue better resolved at summary judgment because they argue that Dr. Gudes "has failed *to produce evidence*" of actual malice. *Id.* (emphasis added). Dr. Gudes has plausibly alleged actual malice, *see* Doc. No. 8 at PageID 41–45, so the motion shall be denied on this basis.

### D. Miscellaneous Qualified Privileges and Signed Release Defense

Defendants assert that other privileges shield them from discovery; namely, the "common interest" privilege, the "opinion" privilege, the "public concern" privilege, and the privilege for relaying "information pertaining to . . . job performance" to a prospective employer, under Ohio Rev. Code § 4113.71. Doc. No. 6-1 at PageID 27–31. They further contend that Dr. Gudes's signed release, permitting them to submit this information to the NPDB, shields them from liability. *Id.* at PageID 31; Doc. No. 11-1 at PageID 68. However, none of these defenses apply if the publisher made the statements with actual malice. *See* Part III(A)–(C); *see also*, *e.g.*, *Lograsso v. Frey*, 10 N.E.3d 1176, 1181–82 (Ohio Ct. App. 2014); *Chandler & Assocs., Inc. v. America's Healthcare All., Inc.*, 709 N.E.2d 190, 197–99 (Ohio Ct. App. 1997); *Green*, 504 F. Supp. 3d at 830 (applying Ohio law). This applies to the release, as it permitted Defendants to release this information only if "done in good faith and without malice[.]" Doc. No. 6-2 at PageID 33. Because Dr. Gudes has plausibly alleged otherwise, he may proceed to discovery.

IV.

Based upon the foregoing, Defendants' motion for judgment on the pleadings is **GRANTED IN PART AND DENIED IN PART**. Doc. No. 11. Dr. Gudes may pursue his damages claims against Defendants, but, as of this date, he has failed to exhaust his administrative remedies as to his request for a permanent injunction. Therefore, Plaintiffs' request for a permanent injunction is **DENIED WITHOUT PREJUDICE AND SUBJECT TO EXHAUSTION OF HIS ADMINISTRATIVE REMEDIES**. Because this addresses the arguments Defendants made in the motion to dismiss, the motion to dismiss is **DENIED AS MOOT**. Doc. No. 6. The Court shall issue an order requiring the parties to meet and confer, pursuant to Fed. R. Civ. P. 16, by separate entry. Discovery shall proceed forthwith.

**IT IS SO ORDERED**.

August 4, 2023                             s/Michael J. Newman
                                           Hon. Michael J. Newman
                                           United States District Judge